IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| TEXAS DISPOSAL SYSTEMS, INC., § § *Plaintiff,* § § vs. § § ROUTEWARE, INC. § § *Defendant.* § | Civil Action No. 1:14-CV-00200-SS |

# DEFENDANT'S SECOND AMENDED ANSWER AND COUNTERCLAIMS

Defendant Routeware, Inc. ("Defendant" or "Routeware") timely files and serves its Second Amended Answer and Counterclaims, and respectfully shows the Court as follows:

## A. Second Amended Answer

1. Paragraph 1 of Plaintiff Texas Disposal Systems, Inc.'s ("Plaintiff" or "TDS") Original Petition for Declaratory Relief (the "Petition") asserts a Texas state court discovery mechanism that is no longer applicable and to which no response is required. If and to the extent a response is deemed necessary, Defendant denies that discovery is to be conducted under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure.

2. Defendant admits the allegations in Paragraph 2 of the Petition.

3. Defendant admits the allegations in Paragraph 3 of the Petition.

4. Paragraph 4 of the Petition alleges a legal conclusion to which no response is required. If and to the extent a response is deemed necessary, Defendants admit that the Court has subject matter jurisdiction over the claims and controversies in this suit and that the amount in controversy is within the jurisdictional limits of the Court.

5. Defendants admit that venue is proper in this Court and that a substantial part of the present controversy arose in Travis County, Texas.

6. With respect to Paragraph 6 of the Petition, Defendant admits that Plaintiff and Defendant are parties to a Master Agreement, which is dated effective November 14, 2003, and which governs "the purchase and sale, license and other transactions" between Plaintiff, as purchaser, and Defendant, as seller, in relation to Defendant's products, including Defendant's Firmware and Software. Defendant also admits that Plaintiff purchased on-board computer systems from Defendant upon which Defendant's Firmware was installed. Defendant denies any remaining allegations in Paragraph 6 of the Petition.

7. With respect to the Paragraph 7 of the Petition, Defendant admits that at some point after Plaintiff decided to discontinue purchasing Defendant's hardware and licensing Defendant's Firmware and Software, Defendant claimed, among other things, that Plaintiff owed additional licensing fees to Defendant as a result of Plaintiff's copying/cloning, installation and use of Defendant's Firmware in an unauthorized manner. Defendant admits that the Master Agreement, including Sections 3.1.1. and 3.1.2., prohibit Plaintiff from copying/cloning Defendant's Firmware and prohibit Plaintiff from using the Firmware in an unauthorized manner. Defendant denies that Plaintiff was reinstalling licensed Firmware only onto hardware purchased from Defendant. Defendant denies that Plaintiff was authorized to clone/copy, install or re-install the Firmware. Defendant admits that it contends that Plaintiff is obligated to pay a license fee to Defendant for each time it cloned/copied and/or installed/reinstalled the Firmware. Defendant lacks sufficient knowledge or information to form a belief as to whether Plaintiff allegedly experienced reliability or stability issues with Defendant's Firmware and/or problems with the Hardware that Plaintiff had purchased from Defendant. Defendant admits that Plaintiff

disputes that Sections 3.1.1. and 3.1.2. of the Master Agreement (or any other provision) creates an obligation on the part of Plaintiff to pay additional license fees relating to Plaintiff's cloning/copying, installation and/or alleged reinstallation of the Firmware. Defendant denies any remaining allegations in Paragraph 7 of the Petition.

8. With respect to Plaintiff's allegation contained in Paragraph 8 of the Petition that "Plaintiff incorporates all previous allegations as if restated in their entirety," Defendant adopts and incorporates its corresponding responses to such previous allegations of Plaintiff as if restated in their entirety.

9. With respect to the Paragraph 9 of the Petition, Defendant admits that an actual controversy exists between Plaintiff and Defendant regarding the interpretation of the Master Agreement and Plaintiff's obligations to pay additional license fees to Defendant relating to Plaintiff's unauthorized cloning/copying, use, installation and/or reinstallation of the Firmware. Defendant denies any remaining allegations in Paragraph 9 of the Petition.

10. With respect to Plaintiff's requests for declaratory relief contained in Paragraph 10 of the Petition, Defendant denies that Plaintiff is entitled to the requested declaratory relief and denies that Plaintiff is entitled to any judgment, order, or award.

11. With respect to Plaintiff's allegation contained in Paragraph 11 of the Petition that "Plaintiff incorporates all previous allegations as if restated in their entirety," Defendant adopts and incorporates its corresponding responses to such previous allegations of Plaintiff as if restated in their entirety.

12. With respect to Paragraph 12 of the Petition, Defendant denies that Plaintiff is entitled to recover its reasonable attorneys' fees against Defendant. Defendant denies any remaining allegations in Paragraph 12 of the Petition.

13. With respect to Paragraph 13 of the Petition, Defendant admits that all conditions precedent to Plaintiff seeking the declaratory relief it seeks have been performed or occurred. Defendant denies that Plaintiff is entitled to the declaratory relief it seeks and denies that Plaintiff is entitled to any relief, judgment, order, or award.

14. With respect to Plaintiff's Prayer for Relief contained on pages 3 through 4 of the Petition, Defendant denies that Plaintiff is entitled to any relief, judgment, order, or award.

15. Except as expressly admitted or denied above, Defendant denies any remaining allegations contained in the Petition and denies that Plaintiff is entitled to any relief, judgment, order, or award.

## B. Amended Counterclaims against Plaintiff

16. As more fully set forth below, Routeware asserts counterclaims against TDS for: (a) breach of contract; (b) copyright infringement; and (c) Digital Millennium Copyright Act ("DMCA") violations, all arising from TDS's violation of Routeware's various rights in proprietary DMS5000 Firmware, as defined below.

### B.1. Parties

17. Routeware is and at all times relevant has been a Delaware corporation, with its principal place of business in Beaverton, Oregon. It is, therefore, a citizen of the State of Delaware and a citizen of the State of Oregon.

18. TDS is a corporation based in and organized under the laws of the State of Texas, with its principal place of business in Travis County, Texas. It is, therefore, a citizen of the State of Texas. TDS has made an appearance herein, and may be served with this Second Amended Answer and Counterclaims through its counsel of record.

### B.2. Jurisdiction & Venue

19.     The Court has jurisdiction over Routeware's counterclaims for copyright infringement and DMCA violations pursuant to 28 U.S.C. § 1331, because those counterclaims arise under the federal laws of the United States. Jurisdiction over Routeware's counterclaims for copyright infringement and DMCA violations also is proper pursuant to 28 U.S.C. § 1338(a), because those claims arise under Acts of Congress relating to copyrights. The Court has supplemental jurisdiction over Routeware's counterclaim for breach of contract pursuant to 28 U.S.C. § 1367 because that state law claim is so related to the claims over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) that they form part of the same case or controversy under Article III of the United States Constitution. The Court also has jurisdiction over Routeware's counterclaim for breach of contract pursuant to 28 U.S.C. § 1332(a)(1) because TDS and Routeware are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because TDS resides in this judicial district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the counterclaims occurred in this district. Venue also is proper in this district pursuant to 28 U.S.C. § 1400(a) because Routeware asserts counterclaims for copyright infringement and DMCA violations under Acts of Congress relating to copyrights and TDS resides in this district. Venue is also proper in this district under 28 U.S.C. § 1441(a) because the state court where the lawsuit was originally filed and had been pending before removal is located in this district.

### B.3. Satisfaction of Conditions Precedent
### and Statutory Requirements for Filing Copyright Claim

21.     *Conditions Precedent.* All conditions precedent have been performed or have occurred. *See* FED. R. CIV. P. 9(c).

22.     *Copyright Registration.* Effective March 26, 2014, Routeware was granted a copyright registration by the United States Copyright Office (the "Copyright Office") for Routeware's DMS5000 Firmware (Routeware Build 103). *See* **Exhibit A** (Certificate of Registration).[1]  As such, Routeware has satisfied the statutory prerequisites for filing its copyright infringement and DMCA claims in this suit. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991).

### B.4. Factual Background

23.     Founded in 1999, Routeware helps waste haulers (like TDS) optimize routes, track driver field activity, and cut costs with a powerful combination of on-board computing and back office software.  In connection therewith and until approximately mid-2007, Routeware sold to its customers on-board computing hardware known as DMS3000 units, and licensed to its customers the embedded firmware (i.e., the operating system and application layer) and associated software.  In mid-to-late 2007, Routeware began selling to its customers the successor to the DMS3000 units, known as DMS5000 units.  The firmware embedded in the DMS5000 units is entirely different firmware from the firmware that had been embedded in the DMS3000 units.  Routeware spent significant time developing the unique proprietary firmware (i.e., the operating system and application layer), including Routeware Build 102, Routeware Build 103, and Routeware Build 104, embedded into DMS5000 units (the "DMS5000 Firmware").

---

[1] On June 10, 2014, Routeware also filed, with the Copyright Office, its applications for copyright registration for Routeware Build 102 and Routeware Build 104, and paid the required filing fees. *See* **Exhibit B** and **Exhibit C**. On June 10, 2014, Routeware also submitted to the Copyright Office petitions for relief from deposit copy requirements along with the requisite deposit materials of Routeware Build 102 and Routeware Build 104.

24.     The DMS5000 Firmware reflects expressive choices in both the literal elements (i.e., the source code and object code) and its nonliteral elements, including its, structure, design, workflow, sequence, organization, user interface, input and output, screen displays, menu structures, and the specific terminology and graphics used throughout the program.

25.     In or around November 2003, Routeware and TDS entered into a Master Agreement, effective November 14, 2003, which governs "the purchase and sale, license and other transactions" between TDS, as purchaser, and Routeware, as seller, in relation to Routeware's "Products" (the "Contract").

26.     Specifically, Routeware agreed to deliver to TDS, and TDS agreed to accept and pay for, all Products (i.e., Firmware, Hardware or Software and related installation, support and maintenance services sold or licensed) purchased pursuant to any order accepted by Routeware. The term "Hardware" specifically encompassed any model of the Routeware DMS3000 unit or its subsequent replacement (i.e., the successor DMS5000 unit). "Firmware" was defined as "the operating system and application layer that runs inside the Hardware." And "Software" meant "the computer software programs and documentation furnished to [TDS] by Routeware for use with the Hardware . . . ."

27.     Pursuant to the Contract, TDS purchased and/or licensed from November 2003 through early-to-mid 2007 various Products from Routeware, including DMS3000 units and associated firmware. Between mid-to-late 2007 and mid-2010, TDS continued to purchase and/or license various Products from Routeware pursuant to the Contract, including DMS5000 units and associated DMS5000 Firmware.

28.     Under the Contract, although title to the Hardware passed to TDS upon full payment, Routeware retained title to the DMS5000 Firmware and granted TDS only a

nonexclusive, nontransferable license to use the DMS5000 Firmware in a specified manner. The Contract provides in relevant part:

> 3.1. Title and License
>
> 3.1.1 Title and risk of loss will pass to [TDS] upon payment in full by [TDS] for the Products; provided, that Routeware will retain all title to all . . . Firmware and all intellectual property rights associated therewith and with the Hardware. Subject to the terms and conditions of this Agreement, Routeware grants to [TDS] a nonexclusive, nontransferable license to **use all Firmware solely in conjunction with its use and operation of the Hardware** and only in accordance with applicable instructions and manuals furnished by Routeware (if any).
>
> 3.1.2 [TDS] will not reverse engineer, reverse compile or reverse assemble the Firmware in whole or in part, except and only to the extent that such activity is expressly permitted by applicable law.
>
> 3.1.3 [TDS] will use the Firmware solely in connection with [TDS's] own internal operations, and **will not modify the Firmware** or lend, lease, rent or transfer the Firmware, in whole or in part, to any third party.
>
> 3.1.4 All rights not expressly granted herein are reserved by Routeware.

29. Near the end of 2010, TDS stopped purchasing Products from Routeware and stopped paying annual fees for support.

30. In 2012, Routeware attempted to sell additional Products to TDS. In connection with its efforts, Routeware first grew to believe in or around March 2012 that TDS had copied/cloned Routeware's DMS5000 Firmware in violation of the Contract and the DMCA, and had infringed Routeware's copyrights.[2] Routeware also learned that TDS had been purchasing hardware that is substantially similar to Routeware's DMS5000 hardware directly from the manufacturer, Smart Terminal. Because such hardware does not have the DMS5000 Firmware necessary to operate for TDS's intended purpose, TDS apparently consulted with former

---

[2] Pursuant to the discovery rule, Routeware's counterclaims are timely brought. More specifically, Routeware did not know and did not have reason to know of TDS' breaches of contract, copyright infringement, violations of the DMCA, or the injuries upon which Routeware's counterclaims are based until at least March 2012, and possibly later.

Routeware employees and contractors (together, the "TDS Consultants") in order to clone Routeware's DMS5000 Firmware onto new hardware purchased from Smart Terminal. In order to do so, TDS and/or the TDS Consultants would have had to access the DMS5000 Firmware by bypassing and/or circumventing technological measures designed to control and prevent unauthorized access to and cloning/copying of the DMS5000 Firmware.

31. On January 10, 2013, Routeware exercised its rights under the Contract to conduct an inspection and audit of the Routeware software at TDS's facilities, and also remotely access the TDS servers that run Routeware software. Initially, TDS refused to allow the inspection and audit. Ultimately, TDS allowed only a limited inspection and audit, but refused to allow Routeware representatives to inspect the DMS5000 units installed in TDS's trucks.

32. Routeware's limited inspection and audit confirmed at least 525 unauthorized instances in which Routeware's DMS5000 Firmware had been re-imaged onto hard drives by TDS and/or others working at its direction, including many instances where the DMS5000 Firmware was running on computers/units not sold by Routeware, including DMS5000 Firmware cloned to DMS5000 units running on TDS's trucks.

33. The retail price/licensing fee for Routeware's DMS5000 Firmware is $2850/unit for a customer of TDS's size, if Routeware's understanding of TDS's size is accurate.

### B.5. Breach of Contract

34. Routeware incorporates by reference the allegations contained in paragraphs 21 through 33 as if fully set forth herein.

35. The Contract between Routeware and TDS is valid and enforceable.

36. Routeware is a proper party to sue for breach of the Contract.

37. Routeware performed, tendered performance of, or was excused from performing

its obligations under the Contract.

38. TDS breached the Contract.

39. TDS's breach of the Contract caused damages to Routeware in excess of the minimum jurisdictional limits of this Court. Routeware seeks recovery of its actual damages, out-of-pocket costs, and consequential, special, and incidental damages, including, but not limited to the retail price/licensing fee for each instance of Firmware that TDS cloned/copied and/or used in violation of the Contract.

### B.6. Copyright Infringement

40. Routeware incorporates by reference the allegations contained in paragraphs 21 through 33 as if fully set forth herein.

41. The DMS5000 Firmware was created and is used in the United States. Routeware owns a valid copyright in the DMS5000 Firmware (as the protected elements are both sufficiently original and copyrightable). The DMS5000 Firmware reflects expressive choices in both the literal elements (i.e., the source code and object code) and in its nonliteral elements, including its, structure, design, workflow, sequence, organization, user interface, input and output, screen displays, menu structures, and the specific terminology and graphics used throughout the program.

42. TDS has cloned/copied the DMS5000 Firmware and/or or its component parts that are original. The firmware cloned/copied, installed and/or reinstalled by TDS is identical, or at the very least is substantially similar, to the DMS5000 Firmware because TDS literally cloned/copied the DMS5000 Firmware and/or its component parts that are original. Such activity violates Routeware's exclusive rights in the DMS5000 Firmware (including the right to copy, distribute and create derivative versions of the DMS5000 Firmware).

43.     Moreover, TDS's infringement was intentional, knowing and reckless. For example, by virtue of its purchase of the DMS5000 units and licensing of the DMS5000 Firmware, TDS knew that the DMS5000 Firmware was owned by Routeware. Further, TDS through its employees and the TDS Consultants had extensive knowledge of Routeware's products, including the Firmware. Moreover, upon information and belief, TDS utilized the TDS consultants to bypass and/or circumvent technological measures implemented by Routeware that were designed to control and prevent unauthorized access to and cloning/copying of the DMS5000 Firmware.

44.     TDS's infringing activities entitle Routeware to actual damages in excess of the minimum jurisdictional limits of this Court, including lost licensing fees, any profits obtained by TDS from use or exploitation of the cloned/copied DMS5000 Firmware and/or its component parts, interest and costs.

### B.7. DMCA Violations

45.     Routeware incorporates by reference the allegations contained in paragraphs 21 through 33 as if fully set forth herein.

46.     In cloning/copying, installing and/or reinstalling Routeware's DMS5000 Firmware, TDS had to bypass and/or circumvent technological measures designed to control and prevent unauthorized access to and cloning/copying of the DMS5000 Firmware, all in violation of the DMCA. *See* 17 U.S.C. § 1201(a)(1)(A).

47.     The technological measures designed to control and prevent unauthorized access to and cloning/copying of the DMS5000 Firmware, in their ordinary course of operation, require the application of information and/or a process, with the authority of Routeware, to gain access to the DMS5000 Firmware. Specifically, Routeware does not provide its customers with

physical copies (i.e., CDs or DVDs) of the Firmware to install. Instead, Routeware installs the Firmware onto the hardware before delivery to its customers to avoid providing customers physical media from which to copy or clone the Firmware. Additionally, Routeware installs a program (DMS Shell) that, while allowing customers to run the Firmware application in connection with use of the hardware, otherwise prevents, in its ordinary course of operation, access to the underlying Firmware and also prevents customers from running any program on the hardware except for the Firmware. Upon information and belief, Routeware contends that TDS hacked or otherwise bypassed DMS Shell (without the use of a password) in order to copy/clone Routeware's Firmware, and TDS was not authorized by Routeware to gain such access.

48. TDS's DMCA violations entitle Routeware to: (a) statutory damages ranging from $200 to $2500 per act of circumvention; (b) attorneys' fees; (c) actual damages; and/or (d) profits of TDS that are attributable to the violations and which are not taken into account in computing actual damages. *See* 17 U.S.C. § 1203(b)(3) and (5) and (c).

### B.8. Interest and Costs

49. Routeware seeks from TDS the maximum legal pre-judgment and post-judgment interest. Routeware also seeks from TDS recovery of its costs.

### B.9. Attorneys' Fees

50. Pursuant to applicable Texas law and the Contract, Routeware is entitled to recover from TDS the attorneys' fees it reasonably and necessarily has incurred or will incur in connection with its counterclaim for breach of contract. *See* TEX. CIV. PRAC. & REM. CODE §§ 38.001 *et seq.*

51. Pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009, the Contract and TDS' declaratory judgment action, Routeware also seeks recovery of its costs and reasonable and

necessary attorneys' fees as are equitable and just.

### C. Jury Demand

52. Routeware has previously filed, and hereby confirms, its demand for a jury trial.

### D. Prayer for Relief

**WHEREFORE**, Routeware prays that, on final trial of this cause, the Court enter a final judgment in its favor:

    a.    denying Plaintiff's request for declaratory relief and request for attorneys' fees;

    b.    awarding Routeware on its counterclaims against Plaintiff its actual damages, lost licensing fees, profits of TDS attributable to TDS's copyright and DMCA violations, out-of-pocket costs, and any and all consequential, special, and incidental damages to which Routeware may be entitled;

    c.    awarding Routeware statutory damages;

    d.    awarding Routeware its reasonable and necessary attorneys' fees, costs and prejudgment and post-judgment interest; and

    e.    granting any other and/or further relief, both in law and in equity, to which Routeware may be justly entitled.

Respectfully submitted,

K&L GATES LLP

By: _____
Gregory P. Sapire
Texas State Bar No. 00791601
Jonathan R. Dotson
Texas State Bar No. 24036495

2801 Via Fortuna, Suite #350
Austin, Texas 78746
(512) 482-6800 Telephone
(512) 482-6859 Facsimile
greg.sapire@klgates.com
jon.dotson@klgates.com

**ATTORNEYS FOR DEFENDANT
AND COUNTERCLAIM PLAINTIFF
ROUTEWARE, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and complete copy of the foregoing instrument has been served pursuant to Fed. R. Civ. P. 5 in the manner indicated below upon all attorneys of record on this 18th day of July, 2014, as follows:

| Steve Smit<br>GRAVES, DOUGHERTY, HEARON & MOODY, P.C.<br>401 Congress Avenue, Suite 2200<br>Austin, Texas 78701<br>(512) 480-5853 (fax)<br>SSmit@gdhm.com<br>*Attorneys for Plaintiff*<br>*Texas Disposal Systems, Inc.* | ____ via Certified Mail, RRR<br>____ via U.S. Mail (First Class)<br>____ via Federal Express<br>_✓__ via Facsimile<br>____ via E-mail<br>____ via Messenger |

_____
Jonathan R. Dotson

**DEFENDANT'S SECOND AMENDED ANSWER AND COUNTERCLAIMS – PAGE 14 OF 14**
AU-238575 v4